Baldwin, J.
This is what is known as a discrimination case.
*306 The plaintiffs below, Scofield, Shurmer & Teagle, set forth, substantially , that they were manufacturers of refined petroleum oil in the city of Cleveland; that it was necessary for them, in order to reach their customers, to use the means of conveyance offered by the Lake Shore & Michigan Southern Railway Company; that a very large share of the business of manufacturing and distributing refined petroleum for Cleveland was done by the Standard Oil Company (in fact it appears that it did nine-tenths of all the business); that the Lake Shore & Michigan Southern Railway Company gave a rebate to the Standard Oil Company on all rates of freight which were charged to other customers. It is not claimed that the rates of freight which were charged other customers, were unreasonable in themselves; but it is said that the Standard Oil Company did very much the larger share of all the business, and that the giving of a steady rebate to it on all freights operated very much in its favor, and would make it difficult for any other oil company to do business in competition with it, and tended to the destruction of the business of any other company. The petition alleged that they sent a number of barrels of oil, on which a certain fixed discrimination of ten cents a barrel was made. Then it set forth that they themselves, Scofield, Shurmer & Teagle, had tank cars which they offered to have used upon this line of railway for the purpose of transporting oil; but that the railway company refused to receive their oil in bulk in such cars, although they did so for the Standard Oil Company, and that in that a still larger discrimination was made in favor of the Standard Oil Company. They further alleged that the railway company, still discriminating, refused any of their cars to be switched over to the works of Scofield, Shurmer & Teagle, and that caused them quite an expense. They claimed, perhaps, a thousand dollars damages by reason of the necessary cartage, and their petition closed with the allegation that their business had suffered very much generally, and they claimed damages to the amount of $100,000.
It is claimed by the plaintiff in error, by amendments that were allowed by the court to be made to the petition in error to this court, that the state court has no jurisdiction in this matter.
*307 Sections 3368 and 3378, of the statutes of Ohio, forbid discrimination, and provide for the assessment of certain fines.
It is claimed in this case that the rights which Scofield, Shurmer & Teagle, the plaintiffs below and the defendants in error in this case, had, were common law rights, and that notwithstanding this statute which gives certain specific remedies, they had a right of redress at common law against this corporation for. such discrimination. So far as that matter is concerned, it seems to be completely settled by a case between the same parties and relating substantially to the same kind of transactions in the 43 Ohio St. That was an action for an injunction against threatened discrimination, and this is an action for damages for discriminations which have already taken place. I do not propose to read that case; it is a very long one, and, for some of the purposes of this case, it is fortunately very full. A portion of the syllabi are as follows :
“ (1.) A railroad company, organized under the statutes of Ohio, is a common carrier, and is subject to judicial control to prevent the abuse of its powers and privileges.
“ (2.1 Where a lower rate is given by such corporation to a favored shipper, which is intended to give, and necessarily gives, an exclusive monopoly to the favored shipper, affecting the business and destroying the trade of other shippers, the latter have a right to require an equal rate for all under like circumstances.
“ (3.) Where such a corporation, as a common carrier, in consideration of the fact that a shipper furnished a greater quantity of freights than other shippers during a given term, agrees to make a rebate on the published tariff on such freights to the prejudice of the'other shippers of like freights under the same circumstances, Held: Such a contract is an unlawful discrimination in favor of the larger shipper, tending to create monopoly, destroy competition, injure, if not destroy the business of smaller operators, contrary to public policy, and will be declared void at the instance of parties injured thereby.
“ (4.) Such a contract of discrimination cannot be upheld simply because the'Jfavored shipper may furnish for shipment during the year a larger freightage in the aggregate than any *308 other shipper, or more than all others combined. A discrimination resting exclusively on such a basis will not be sustained.
“ (5.) Although a court will ordinarily look to the interest of a common carrier as an element in the case when a contract with him relating to freightage is attempted to be upheld or set aside, such a contract will not be sustained by the courts simply because the business to be done under it is i largely profitable’to him.”
It is not necessary for me to read the other syllabi, or to read any part of the opinion, and sufficient to say that a large share of the opinion in this case is made up of a discussion of whether or not there was a right at common law and outside of any statute, on the part of the plaintiffs in that case to secure the relief which was there sought, and after a full discussion of the subject the court arrived at the very satisfactory conclusion that there were those common law rights.
Then we stand in this position : The supreme court of the state of Ohio have decided, and in our opinion have wisely decided, that the plaintiffs in this case have a common law right to relief, and that brings us again to the claim that was suggested, that notwithstanding there is that common law right, it is a regulation of inter-state commerce, and the state courts have no right to grant a remedy in such a case.
It is claimed that a large share, if not all, of the shipments which had been made by the plaintiff below in this case, were made outside of the state. I believe the statement was made on one side that that every shipment on which it was proved and claimed that there was a rebate, was made to places that were outside of the state.
The claim that the state court has no jurisdiction, is based upon a late decision of the supreme court of the United States, made since the decision in 43 Ohio St., 557, and upon the following clause of the constitution of the United States :
“ The congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes.”
It is claimed that that power of congress is an exclusive power. In fact the supreme court of the United States, in 118 *309 United States Supreme Court Reports, say that it is an exclusive power, and that the regulation of commerce among the states is confided exclusively to Congress under the constitution.
This case of Railway Company v. The State of Illinois, in the 118th United States Reports, 557, was a case arising upon a statute of the state of Illinois, which the supreme court of that state had held was intended to apply to contracts of shipment made from one place in Illinois to places in other states. In short, that it affected inter-state commerce, and it provided penalties, as our own statute provides penalties, and action was brought for the recovery of these penalties.
It will be observed that the right of action ip that case was claimed exclusively under the statute of the state of Illinois.
The supreme court of the United States, following the supreme court of Illinois, held that the statute of Illinois was intended to apply t'o transportation under one contract and by one voyage from the'interior of the state of Illinois to New York, and at the close of the syllabus held :
“ A statute of a state, intended to regulate, or to tax, or to impose any other restriction upon the transmission of persons, or property, or telegraphic messages, from one state to another, is. not within that class of legislation which the states may enact in the absence of legislation by Congress ; and that such statutes are void even as to that part of such transmission which may be within the state.
“ It follows that the statute of Illinois, as construed by the supreme court of the state, and as applied to the transaction under consideration, is forbidden by the constitution of the United States; and the judgment of that court is reversed.”
" On page 571, Mr. Justice Miller says, and it is the sum and substance of the decision :
“ But we think it may safely be said, that state legislation which seeks to impose a direct burden upon inter-state commerce, or to interfere directly with its freedom, does encroach upon the exclusive power'of congress. The statute now under consideration, in our opinion, occupies that position. It does *310 not act upon the business through the local instruments to be employed after coming within the state; but directly upon the business as it comes into the state £rom without, or goes out from within. While it purports only to control the carrier when engaged within the state, it must necessarily influence his conduct to some extent in the management of his business throughout his entire voyage. It was to meet just such a case that the commercial clause in the constitution was adopted.”
There is not one word said in that case from beginning to end about common law rights. The whole discussion is upon the statute, and the whole examination which the court gives to the subject, is upon the statute and the right of the legislature of the state of Illinois to pass that statute. There is not one word said in the whole case, from which it can be implied that the court were inclined to deny that there were common law rights, and common law rights which might be applied to commerce from state to state; • nor that they would deny such a remedy; nor, perhaps, on the other hand, an implication the other way, except, as is quite evident from a reading of the case, that they were very careful to say that the only point which they were considering was the power and authority of the legislature of the state of Illinois to pass such an act.
The learned Justice Miller, who delivered that opinion, has expressed the opinion in other cases that there were such common law rights, which in the Express Cases in 10 Federal Reporter he thought extended so far as to require equal facilities and terms of traffic to be given to all Express Companies asking it, and which “should be extended on equal terms to all who are actually and usually engaged in the express business.”
The Express Cases were overruled in the 117 U. S., 1; but the opinion presumes the rights of individuals at common law. At page 26, Chief Justice Waite says, the exact question “ depends as is conceded on whether|allfrailroad companies are now by law charged with the duty of carrying all express companies in the way that express companies when taken are usually carried, just as they are with the\duty of carrying *311 all passengers and freight when offered in the way that passengers and freight are carried.”
It is evident from these cases, and from the dissenting opinion of Mr. Justice Miller in the 117 U. S., that he did not wittingly say anything in the case in the 118th to deny the common law rights of individual shippers.
The United States courts have limited jurisdiction, and precisely such jurisdiction as is given them hy statutes of the United States.
It does not necessarily follow, that because congress may legislate upon a certain subject, there can be no jurisdiction as far as state courts are concerned, which may in some manner bring in question even those statutes; although there are provisions by which, where the construction of a statute of the United States is in question, the matter may be taken for final adjudication to the United States Supreme Court, and under those provisions the case in 43 Ohio St., 577, is now pending there.
There is a vast multitude of cases which have been tried, and which must be tried continually in the state courts, which relate to the inter-state commerce, as in the case of a man bringing a suit for a personal injury claimed to have occurred while being transported from Cleveland to New York, for instance, or for damages where goods were to be transported from Cleveland to New York. In short, a large number of all the cases which concern railroad litigation are cases really relating to commerce, or the transportation of passengers or freight, which was to take place from some point in one state to some point in another state.
It has never entererd the mind of any one of the judges hearing these cases, and I am very well satisfied that it did not enter the minds of the. judges that decided the case in the 118 U. S., that because the transportation of freight was from one state to another there was no jurisdiction on the part of the state courts to hear questions arising out of such transportation.
The counsel produced no authority to show that the state court would have no such jurisdiction, and, we think, for the very good reason that they could not find any. ■
*312 The fact about it is, that the relief which is asked of us, and which was asked of the court of common pleas, in this respect, is not a regulation of commerce within the meaning of that section of the constitution. It is not the office of the court to see that certain new rules should be established, and in that sense to regulate commerce — that is the sense in which the word is used in the constitution — but it is the office of the court to declare such rights as already exist, and it is to be presumed, at any rate until the court is reversed by a higher court, that they do declare only such rights as do exist, and give such remedies as may result from a violation of those rights.
It is our opinion, therefore, that this matter was within the jurisdiction of the court of common pleas.
We said that it is no part of the office of a court to give or declare new rights, but simply to declare the rights as they may already exist. And the reasoning, generally, in regard to these rights is, that railroad companies are great public corporations with large grants to them from the public, and that by virtue of their relations to the public, in that respect, they are bound to accommodate it, and they are bound to accommodate it upon equal terms. They are common carriers, and if they had a right to fix the rates at which they should carry, within their own will, they might as well not be common carriers, because, they might refuse to take a man’s freight by charging him an unreasonably high price.
It is not claimed by counsel on either side that this railway company was not bound to carry, and to carry at a reasonable rate; but it is claimed that if the rate was reasonable in itself, it was bound to carry without discrimination.
The supreme court have said, and have said it very plainly, that a price or a discrimination which operates so unequally and so hard that it might entirely destroy the business of a firm, is not a reásoable price or reasonable discrimination.
We are satisfied with that decision, and were we not we should be obliged to follow it.
There are several exceptions to the charge of the court in this case. There is an exception to what the court said in regard to allowing discounts which had been made by the *313 plaintiffs below to the consignees. It appears that sometimes the plaintiffs below had paid the freight themselves, and sometimes there had been an allowance made to the consignees for it. The testimony of Mr. Teagle, one of the members of the firm of plaintiffs below, was to the effect that they had generally, where they did not pay the freight themselves, made an allowance to the consignees, by which the consignees got oil at the same price at which they could get it from the Standard Oil Company. And it.is pretty plain, as far as good common sense is concerned, that those who entered into competition with the Standard Oil Company were obliged to sell their oil at the different places where the Standard Oil Company sold its oil, at substantially the same price at which the Standard Oil Company sold its oil, or they could not sell it at all; because it is a general law of trade that a man will not pay one firm or company more than he will another for the same article at the same place.
The court below in charging the jury, said:
“If the plaintiffs can recover at all in this action as compensatory damages, they can only recover the actual aggregate amount paid by them for freight, and the interest thereon from the time of payment to the first day of the term of this court, upon shipments made by them over defendant’s road during the period covered by this controvery, as above stated, over and above • the amount charged the Standard Oil Company for like shipments during the same period, after deducting from charges made to said Standard Oil Company the rebates allowed said company by said defendant. But when I say the actual amount charged by them for freight, I mean the money they paid the defendant, and also the discounts they made the several consignees on shipments who paid the freight thereon, which discounts you must find from the evidence were made solely and for no other purpose than to compensate said consignees for the freight they were compelled to pay over and above what was charged on shipments made by the Standard Oil Company, less rebates on like shipments to the same points.” If Scofield, Shurmer <fc Teagle were, on account of a lower rate charged the Standard Oil Company, obliged to allow ten *314 cents a barrel discount to a man who bought oil from them, it was a loss to them and an injury to their business, and, in an action upon a tort, the Lake Shore Railway Company would be just as liable as if the money had been paid to it.
Counsel for the Railway Company discussed this case as if it were an action upon an account, or an action where too much had been paid to the Lake Shore & Michigan Southern •Railway Company upon a contract; but that is not the nature of this case. This action is upon a tort; it is not upon a contract. Exactly what these parties complain of is, that the railway company would not make such contracts as it was their duty to make, so that the action is pure and simple an action to recover on account of a wrong claimed to have been done by the railway company to the plaintiffs below in violation of the rights which they had against this railway company as a common carrier, and it is upon that basis and theory that the case is considered.
We think that the rule there laid down in regard to damages, if anything, was rather narrow.
The next exception is the following portion of the charge : “ What is an equality, perhaps, may depend on many things. It is easy to see that to discriminate between shippers at the mere caprice or whim of the carrier, everything else being equal, is unjust, unfair and wrong. A discrimination on the part of this defendant in favor of the Standard Oil Company against the plaintiffs, on the ground that the Standard Oil Company furnished the largest quantity of oil for shipment, and on that ground alone, everything else being equal, would be and is unwarranted.”
One of the syllabi which I read from the case in the 43 Ohio St., covers that precise charge and gives it as nearly as it could fairly be expected in the very language; and until we see that the supreme court are wrong we will say that that charge was well given.
The next exception is to this part of the charge:
“Upon that subject, I say to you this: That if these plaintiffs have satisfied you by a fair preponderance of the evidence, that they furnished to the defendant, or offered to place their oil in tank cars, the same as the Standard Oil Company, and *315 if they were refused that right and privilege, and by reason of that refusal were compelled to ship their oil in barrels by carload instead of tanks, they ought not to be charged, although their oil was in barrels, any more freight thereon than was charged the Standard Oil Company, though its oil was in tank cars.”
The evidence in this case showed that -the plaintiffs below owned tank cars; and that their tank cars were actually used in shipments made east. The evidence showing that their tank cars were used in shipments made east, was offered for the purpose of showing that the defendant below knew very well that Scofield, Shurmer & Teagle had tank cars. It also appeared that the railway company refused the use of those tank cars in certain shipments west, and this was the rule of damages which the court gave to the jury in that behalf. We are unable to see why the railway company was not just as much bound to receive tank cars from Scofield, Shurmer & Teagle as from the Standard Oil Company, from whom they did receive them. The railway company was bound to give Scofield, Shurmer & Teagle equal facilities in the transportation of oil. We do not see why the rule laid down by the court below was not correct.
• It may well be, perhaps, that the plaintiffs below lost more money by the difference in the rates of transportation in the one case than in the other, because in the one case it was necessary for them to furnish barrels in which to transport the oil, besides paying a difference in the rate of freight, while in the other, if tank cars were used, of course the same tank would come back, and it would be unnecessary to furnish barrels. It will be fair to presume that the reason why tank cars are preferable to barrels is, that the cost of transportation is less by the use of tank cars.
There is an exception to what the court said as to the rights of the plaintiff in regard to cartage; but the jury brought in a special verdict and found no damages whatever on that branch of the case, which, of course, is the end of that.
Considerable objection was made to what the court said as to exemplary damages, and especially as to attorneys’ fees. The court charged the jury as follows on that question:
*316 “Care should be exercised on the part of the jury in passing upon this claim of exemplary damages. No prejudice, no bias, but cool, dispassionate judgment should be brought to bear upon the facts that go to make up this claim.
“ Ordinarily, as already said, when a party has been compensated, under the rules of law, for what he has lost, he is restored to everything that he has a right to have, and it is only when you desire to inflict punishment upon the party who has done the acts complained of in such a manner, and as you think, in the exercise of a sound discretion would justify you in punishing him, and that he nor others, who are so disposed, will hereafter be guilty of like things.
“ One other thing I am requested to say to you: That if you find for the plaintiff in this action, you may add to the compensatory damages, to which he is otherwise entitled, reasonable attorneys’ fees for services in this case. Now I say to you upon that subject, if you find that the wrongs complained of were done for the purpose of harrassing and injuring the plaintiff, and with that intent and purpose, you may add to the compensatory damages what, in your judgment, would be reasonable attorneys’ fees'^or the plaintiffs in this action.”
There seems to be a double exception to this. That is, it is claimed that this is not such a case as would entitle the plaintiffs below to exemplary damages against the defendant below; and that what the court said in regard to the right to recover attorneys’ fees as compensatory damages, was not correct.
There are two or three cases in our reports in which this subject of attorneys’ fees as compensatory damages has been considered. In the case of Roberts v. Mason, 10 Ohio St., 278, it is said in the syllabi:
“ (1.) In an action to recover damages for a tort which involves the ingredients of fraud, malice or insult, a jury may go beyond the rule of mere compensation to the party aggrieved, and award exemplary or punitive damages; and this they may do, although the defendant may have been punished criminally for the same wrong.
“ (2.) In such a case the jury may, in their estimate of compensatory damages, take into consideration and include rea *317 sonable fees of counsel employed by the plaintiff in the prosecution of his action.”
That is followed by. the case of Finney v. Smith, 31 Ohio St., 529, and the case of Peckham Iron Company v. Harper, 41 Ohio St., 100.
These three cases lay down the doctrine that in an action on a tort, where any one of these elements of fraud, malice or insult enters, it is proper to allow attorneys’ fees as compensatory damages; and that language, “ compensatory damages,” is used in every one of these cases, and it is used by the court here in this charge under similar circumstances, and it is evidently entirely justified by these cases.
But it is said that the plaintiffs below in this ease were not entitled to any exemplary or punitive damages at all. The fact is that the jury brought in a verdict for $4,000 damages, and $1,000, in place of the $100,000 prayed for in the petition, as punitive or exemplary damages.
The rules upon which a railroad company may be liable to punitive damages, are somewhat laid down in the case of the Atlantic & Great Western Ry. Co. v. Dunn, 19 Ohio St., 162.
“ A corporation may be subjected to exemplary or punitive damages for tortious acts of its agents or servants, done within the scope of their employment, in all cases where natural persons, acting for themselves, if guilty of like tortious acts, would be liable to such damages.”
I will read from pages 170 and 171, because the reasoning seems to apply to this case:
i‘ Is it proper to inquire what is the ground of reason and principle on which exemplary damages are allowable in any case? The answer is ready and clear. Nobody will dispute it. It rests not on the ground of abstract or theoretical justice, but on the ground of public policy — a policy which seeks to promote the public safety; to punish, through the medium of a civil proceeding, a fraudulent, malicious, insulting, or willful wrongdoer, and to hold him up as a warning example to others, to deter them from offending in like manner. Now, why do not the same considerations of public policy apply as well to corporations as to natural persons ? I am unable to see why they do not. Corporations, embodying, as they often *318 do, the concentrated wealth and influence of many individuals, certainly may have the power to do injury at least equal to that of natural persons; and it seems to me that the history of corporations affords no satisfactory guaranty that they may not use that power for purposes inimical to individual and public interests, unless restrained by a consciousness of amenability to effective legal penalties.
“The legislative policy of our.state has been exceedingly liberal towards railroad corporations, in delegating to them, to a liberal extent, its sovereign power of eminent domain; in the unlimited discretion accorded to them in the selection of their routes; in the legal facilities afforded them'for raising the means for the construction of their roads, in authorizing consolidations with other companies, apd in the enactment of penal' statutes for their protection. Directly and incidentally they contribute much to the wealth and convenience of our people; but the wealth that controls them is largely held by persons outside of our state, and is constantly changing hands; and individual stockholders feel but little personal responsibility for wrongs which may be done by their servants to individuals placed within their power. Practically, they have almost a monopoly of the means of travel. Millions of persons annually pass under the control and within the power of their servants. And unless the public, through the medium of our laws, retain the means to exercise an effective restraint upon any tendency to wrongdoing, to which they may be subject, and especially in respect to the care, or the want of it, with which their servants may be selected, it seems to me there is so much danger of the abuse of power in this direction as to forbid the recognition of a distinction between them, acting through agents, and individuals acting in their own proper persons, in respect to the liabilities consequent upon tortious action.”
A very good definition of malice is to be found in the case of Westlake v. Westlake, 30 Ohio St., 634.
“ The term malice, as applied to torts, does not necessarily mean that which must proceed from a spiteful, malignant, or revengeful disposition; but a conduct injurious to another, though proceeding from an ill-regulated mind, not sufficiently *319 cautious before it occasions an injury to another. 11 Serg. & R., 39, 40. If the conduct of the defendant was unjustifiable, and actually caused the injury complained of by the plaintiff, which was a question for the jury, malice in law would be implied from such conduct, and the court should have so charged.”
And in this case it is charged by the plaintiffs below, that this railway company entered into such a combination with the Standard Oil Company against them as was malicious. It was proved, or at least attempted to be proved, that there was a contract between the Standard Oil Company and this railway company, by which it was agreed that the Standard Oil Company should have a rebate on any rate that should be charged to any other person shipping oil. It was said that this corporation refused to ship oil for the plaintiffs below in several particulars, discriminating between them and the Standard Oil Company not only in the price, but in other particulars; that the plaintiffs below then shipped their oil by anpther railroad, and that the Lake Shore Company then entered into a contract with that other railroad company, by which it, the Lake Shore Company, agreed to give the second railroad company thirty per cent, of the traffic which it received from the Standard Oil Company on the second railroad company, promising that it would no longer transport oil for Scofield, Shurmer & Teagle at the same rates. In short, that it entered into a contract with another railroad company for the purpose of preventing the other railroad company from giving Scofield, Shurmer & Teagle equal rates with the Standard Oil Company.
It is said that the sole object which the Lake Shore Railway Company had in doing that, was to make money for itself, and that probably its only direct motive was to keep that business. It was said that the Standard Oil Company threatened that it would withhold its business from this railway company unless it prevented the shipping of oil over the other railroad at similar rates. There was some evidence tending to show that. If that were true, although the primary object of the Lake Shore Company was to make money for itself, the nat *320 ural and intended consequences of its acts were injurious to Scofield, Shurmer & Teagle.
It would be no defense, for instance, in an action for assault and battery, to show that the man who committed it was hired by some other persons to do it, and that he did it simply for money, without any ill-will towards the person upon whom he committed the assault and battery.
That the motive, where these, acts are done for the sake of money, does not excuse the act, is settled, if it need at all be settled, in 16 Ohio St., 72, and in 26 Ohio St., 184.
We are of the opinion,' then, that this part of the charge was perfect^ correct; and we may say generally in regard to this charge and the manner in which the case was tried generally, that we have found it to be unusually careful and able. The judge evidently was cautious and careful in what he said, and if there was too much caution upon either side, it was a caution in behalf of the railway company when he intimated to the jury, that they would be confined to the damages which were actually proved to be the difference between the rate§ of freight on the property which was actually shipped over the railway, because there might be other damages which were caused to the business. The last clause of the petition set forth general damages suffered by the plaintiffs below in the injury to their business; and in the Burhhardt case,' in 42 Ohio St. under that kind of an allegation, there is a good deal more scope given in the means of proof than the actual difference which might be proved in a case. It there extends the proof to a wider scope than simply showing the actual loss of profits on the business done by customers of one firm who were actually proved to be induced to deal with another firm.
There are a number of éxceptions to the admission and rejection of evidence. In the first place it is said that there was a, vast amount of evidence introduced, under the original petition, as to damages covering the period from the year 1879 to the year 1883. It was finally agreed, before the case *went to the jury, that no damages should be given for anything that occurred prior to 1881, and it was agreed that a certain number of barrels of oil had been shipped after that time on which, as shown by the evidence, the discrimination was a certain *321 amount, and the verdict of the jury was close'to that amount. But it is said that all of this evidence which was offered in regard to damages prior to 1881, was out of the case. * So it was out of the case; if was put out of the case by agreement of counsel before the case went to the jury, and there is no reason, when this was so plainly stated to the jury, why they should have given any further attention to any evidence of what occurred before the year 1881. As long as the pleadings related to damages before 1881, it was proper to introduce that testimony; but when, by the agreement of the parties, that matter was settled, that testimony became of .no importance in the case.
E. J. Estep, Ashley Pond and O. O. Getzen-Danner, for plaintiff in error. • •
Henderson, Kline & Toilets and Hon. J. E. Ingersoll, for defendants in error.
There are quite a number of other exceptions to the admission and rejection of evidence, all of which we have looked over with considerable care; but we find no substantial error in the rulings of the court, and we are, therefore, of the opinion that the judgment of the court below should be affirmed.